**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| BRADD GOLD, Individually and on Behalf of All Others Similarly Situated, | : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No. 10-587-LPS |
| FORD MOTOR COMPANY and FORD MOTOR COMPANY CAPITAL TRUST II, | : : : | |
| Defendants. | : | |

Norman M. Monhait and P. Bradford deLeeuw, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, DE.

    Attorneys for Plaintiff.

Stuart J. Baskin, Jerome S. Fortinsky, and Christopher R. Fenton, SHEARMAN & STERLING LLP, New York, NY.
Jon E. Abramczyk and John P. DiTomo, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.

    Attorneys for Defendants.

---

## <u>MEMORANDUM OPINION</u>

April 2, 2012
Wilmington, Delaware.

STARK, U.S. District Judge:

## I. INTRODUCTION

Currently pending before the Court is Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim. (D.I. 21) The Court held a hearing on September 22, 2011. (D.I. 30) (hereinafter "Tr.") For the reasons set forth below, the Court will grant Defendants' motion to dismiss.

## II. BACKGROUND

### A. The Parties and the Securities

In 2002, Defendant Ford Motor Company ("Ford") raised capital through the creation of the Ford Motor Company Capital Trust II ("Trust"). (D.I. 19 ¶¶ 8, 10) The Trust sold 90 million 6.5% Cumulative Convertible Trust Preferred Securities ("Trust Preferred Securities") for $50 each to the investing public, and invested the proceeds of that offering in Ford's 6.50% Junior Subordinated Convertible Debentures (the "Debentures"). (*Id.*) The Debentures are long-term unsecured debt of Ford; as the holder of the Debentures, the Trust is entitled to receive quarterly interest payments at a rate of 6.50% per year until January 15, 2032, when the Debentures mature. (*Id.* ¶ 8)

The Trust Preferred Securities trade on the New York Stock Exchange ("NYSE") and entitle holders to receive quarterly cash distributions at an annual rate of 6.50% of the $50 liquidation amount per security ("Distributions"). (*Id.* ¶ 10) Under the terms of the Debentures, Ford holds the right to defer interest payments for up to 20 consecutive quarters; at the end of any deferral period, Ford and the Trust are required to pay all interest and Distributions then accrued and unpaid, respectively. (*Id.* ¶ 11)

Plaintiff Bradd Gold ("Gold") was an owner of approximately 21,800 Trust Preferred

1

Securities. (*Id.* ¶ 6) Gold filed the present litigation in his capacity as an individual shareholder, and also on behalf of a purported class.[1]

## B. The Events Leading to the Present Litigation

### 1. Ford Defers Interest Payments and Distributions

The Trust regularly paid quarterly Distributions on the Trust Preferred Securities through December 2008. (*Id.* ¶ 12) In early 2009, however, Ford announced that, beginning with the interest payment due on April 15, 2009, it would exercise its authority to defer interest payments on the Debentures, which in turn would defer Distributions to holders of the Trust Preferred Securities. (*Id.* ¶ 13)

### 2. Ford Resumes Interest Payments and Distributions

On the morning of June 30, 2010, at approximately 8:59 a.m., Ford announced that it would pay the interest that had accrued on the Debentures since April 15, 2009, and resume quarterly interest payments beginning on July 15, 2010. (*Id.* ¶ 14) Ford also announced that the Trust, in turn, would pay previously deferred Distributions on the Trust Preferred Securities, and would resume quarterly Distribution payments beginning on July 15, 2010. (*Id.*) According to Ford's announcement, the Trust would make its Distribution payments "on July 15, 2010, to the holders of record of the Trust Preferred Securities on June 30, 2010." (*Id.*)

### 3. The NYSE Announces the Ex-Distribution Date for the Trust Preferred Securities

At around 11:49 a.m. on June 30, 2010, the NYSE posted an electronic notice to the effect that (a) the exact amount of the July 15, 2010 Distribution per Trust Preferred Security and

---

[1]On September 10, 2010, Gold filed an unopposed motion for appointment as Lead Plaintiff and for approval of his selection of Lead Counsel, which the Court subsequently granted on October 4, 2010. (D.I. 8; D.I. 16) No class has been certified at this point.

(b) the date on which the Trust Preferred Securities would be "ex-distribution" would both be subsequently determined. (*Id.* ¶ 18) The "ex-distribution date" determines when the right to a distribution no longer transfers with the sale of a security. If a security is purchased *on or after* the ex-distribution date, the *seller* receives the distribution rather than the buyer. Conversely, if the security is purchased *before* the ex-distribution date, the *buyer* receives the distribution. (D.I. 22 at 8 n.1; D.I. 24 at 5 n.1)

On the afternoon of June 30, 2010, after Ford's announcement, the NYSE posted an electronic notice setting the "ex-distribution" date for Ford's forthcoming distributions as July 1, 2010. (D.I. 19 ¶ 18) The NYSE also set a "due bill period" for June 28, 29, and 30, requiring that any trades in the Trust Preferred Securities made during that three-day period would entitle the purchasers, rather than the sellers, to receive the July 15, 2010 Distribution payments. (*Id.* ¶ 20)

Thus, whereas the June 30 "record date" announced by Ford initially determined which shareholders would receive the July 15, 2010 distribution from the Trust, the July 1 "ex-distribution date" and "due bill" announcement by the NYSE ultimately determined whether certain record holders as of June 30 could retain the forthcoming July 15 distribution or would, instead, have to provide that distribution to those to whom such record holders had sold their securities.

### 4. Gold Sells Trust Preferred Securities Before the Ex-Distribution Date

On June 30, 2010, during the interval between Ford's announcement in the morning and the NYSE's determination that afternoon of the ex-distribution date, Gold sold 13,800 shares of the Trust Preferred Securities. (*Id.* ¶¶ 16-18) Because those sales occurred before the July 1, 2010 ex-distribution date, and during the "due bill period" announced by the NYSE, Gold was

3

not entitled to be paid and retain the July 15, 2010 Distribution payments for the shares he sold.

## C. Gold Files Suit Against Defendants

On July 8, 2010, Gold filed suit against Ford and the Trust, alleging securities fraud in connection with the July 15, 2010 Distributions. On November 15, 2010, Gold amended his Complaint. (D.I. 19) The Amended Complaint asserts four separate counts against Ford and the Trust, alleging that they committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b); SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5; SEC Rule 10b-17 ("Rule 10b-17"), 17 C.F.R. § 240.10b-17; and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) ("Section 20(a)"). On January 14, 2011, Defendants moved to dismiss the Amended Complaint.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint

4

are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)). While

heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible

on its face" must be alleged. *Twombly,* 127 S. Ct. at 1974. At bottom, "[t]he complaint must

state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each]

necessary element" of a plaintiff's claim. *Wilkerson v. New Media Technology Charter School

Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion

School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported

conclusions and unwarranted inferences," *Schuylkill Energy Resources, Inc. v. Pennsylvania

Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently

false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## B. The Securities Exchange Act of 1934 ("Exchange Act")

### 1. Section 10(b) and Section 20(a)

Section 10(b) provides, in relevant part, that it is unlawful "[t]o use or employ . . . any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as

the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public

interest or for the protection of investors." 15 U.S.C. § 78j(b). Section 20(a) provides, in

relevant part, that "[e]very person who, directly or indirectly, controls any person liable under

any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly

and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

### 2. SEC Rule 10b-5

Rule 10b-5 states:

5

It shall be unlawful for any person, directly or indirectly, . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

### 3.    SEC Rule 10b-17

Paragraph (a) of Rule 10b-17 provides, in relevant part, that with respect to a "dividend or other distribution in cash or in kind," "[i]t shall constitute a 'manipulative or deceptive device or contrivance' as used in section 10(b) of the Act for any issuer of a class of securities publicly traded . . . to fail to give notice in accordance with paragraph (b) of this section." 17 C.F.R. § 240.10b-17(a). In turn, paragraph (b) provides that "[n]otice shall be deemed to have been given in accordance with this section only if" it is "[g]iven to the National Association of Securities Dealers, Inc., no later than 10 days prior to the record date involved." *Id.* § 240.10b-17(b).

## IV.    DISCUSSION

Each of Counts I, II, and III of the Amended Complaint alleges that Ford and the Trust "violated Section 10(b) of the Exchange Act" by employing "a manipulative or deceptive device or contrivance" in contravention of SEC Rule 10b-17 in connection with the July 15, 2010 Distribution. (*See* D.I. 19 ¶¶ 32, 35, 38) Count IV alleges that "Ford is liable pursuant to Section 20(a) of the Exchange Act" for the Trust's violations of Section 10(b) and Rule 10b-17.

6

(*Id.* ¶ 43) Thus, every count in the Amended Complaint alleges that Defendants violated Section 10(b) by failing to comply with Rule 10b-17.

The Court concludes that the Amended Complaint fails to state a claim for a Section 10(b) violation on which relief may be granted. This conclusion necessitates dismissal of the Amended Complaint in its entirety, for the reasons set forth below.

## A. Whether Rule 10b-17 Provides a Private Right of Action

As a preliminary matter, the parties dispute whether Rule 10b-17 provides a private right of action. Plaintiff correctly notes, and Defendants do not dispute, that a private right of action exists under Section 10(b) of the Exchange Act. *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under § 10(b)."); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 (1983) ("[A] private right of action under Section 10(b) of the 1934 Act . . . has been consistently recognized for more than 35 years. The existence of this implied remedy is simply beyond peradventure."). The parties' disagreement concerns whether Rule 10b-17, an implementing regulation promulgated by the SEC pursuant to Section 10(b), also confers a private right of action, such that a violation of Rule 10b-17 may serve as the basis for a Section 10(b) action. On this point, the law is less clear.

First, as Defendants note, the Supreme Court has warned that "the § 10(b) private right should not be extended beyond its present boundaries," because "[c]oncerns with the judicial creation of a private cause of action caution against its expansion." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008).

Second, in terms of statutory interpretation, personal rights must be intentionally and unambiguously conferred through "rights-creating language" that evidences an intent "to confer

7

individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002). Thus, to create a private right of action, a statute's "text must be phrased in terms of the persons benefited." *Id.* at 274 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). To the extent such an intent must also be evident from an agency implementing rule, Rule 10b-17 would seem to fail. The text of Rule 10b-17 does not appear to reflect an intent to confer individual rights upon a class of beneficiaries, nor does it appear to be phrased in terms of any class of persons benefited. To the contrary, as Defendants note, Rule 10b-17 "does not even [require] that notice be given to investors; rather, it requires that notice be provided to the National Association of Securities Dealers, Inc." (D.I. 26 at 3 n.4)

Third, both parties agree that, to date, "no court has yet recognized a cause of action under Rule 10b-17." (D.I. 24 at 7; D.I. 22 at 2) At the same time, Plaintiff correctly notes that "it is equally true that no court has rejected such a cause of action." (D.I. 24 at 7)[2]

The Court finds it unnecessary to decide whether Rule 10b-17 provides a private right of action because, even assuming it does, dismissal is warranted for at least the reasons explained below.

## B.    Plaintiff Fails to Allege Loss Causation as Required Under Section 10(b)

There are six necessary elements of a Section 10(b) action. Briefly summarized, they are: (1) a material misrepresentation or omission, (2) scienter, i.e., a wrongful state of mind, (3) a

---

[2]Plaintiff cites *Pittsburgh Terminal Corp. v. Baltimore and Ohio R.R. Co.*, 680 F.2d 933 (1982), to argue that "a violation of Rule 10b-17 [gives] rise to a claim under Section 10(b) and Rule 10b-5." (D.I. 24 at 7) Plaintiff appears to be relying on a statement from the concurring opinion for the proposition that the "failure of the defendants to give such notice [under Rule 10b-17] rendered them liable in damages under Rule 10b-5." *Id.* at 946. However, aside from being a concurrence that is not binding on this Court, Plaintiff also fails to note that the same opinion states, "we need not decide whether a violation of Rule 10b-17 . . . itself gives rise to an implied right of action for damages under § 10(b)." *Id.* at 945 n.4.

8

connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation, i.e., a causal connection between the material misrepresentation or omission and the loss. *See Stoneridge*, 552 U.S. at 157; *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).

In the Court's view, the Amended Complaint fails to allege the sixth necessary element, loss causation.[3] With respect to this element, in order to prevail on a Section 10(b) claim, the plaintiff bears "the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Thus, "[t]he loss causation inquiry asks whether the [defendant's] misrepresentation or omission proximately caused the economic loss" allegedly suffered by the plaintiff. *McCabe*, 494 F.3d at 426. "Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).

Here, the Amended Complaint alleges that Defendants violated Section 10(b) by failing to comply with the ten-day notice requirement of Rule 10b-17, causing Gold to sell the Trust Preferred Securities "without the required notice of . . . the July 15, 2010 Distribution," resulting in Gold's failure to receive the July 15, 2010 distributions. (D.I. 19 ¶¶ 32-33, 35-36, 38-39, 43-44) However, the Court agrees with Defendants that the Amended Complaint "affirmatively pleads a different cause of the plaintiff's alleged loss;" namely, that it was the "NYSE's independent decision to set the ex-distribution date on July 1," and the accompanying three-day

---

[3]Because the failure to plead a single element of a claim is sufficient grounds for dismissal, the Court does not address whether the Amended Complaint adequately pleads the other remaining elements of a Section 10(b) violation; nor does the Court resolve the other issues and arguments raised in the parties' briefing.

9

due bill period for June 28, 29, and 30, that actually caused Gold's losses with respect to the July 15, 2010 distributions. (D.I. 22 at 19) Specifically, the Amended Complaint alleges that on the morning of June 30, 2010, Gold sold 13,800 shares of Trust Preferred Securities *after* Ford's distribution announcement, but *before* the NYSE had determined the ex-distribution date and due bill period for Ford's forthcoming distributions. (D.I. 19 ¶¶ 16-18) Therefore, the Amended Complaint demonstrates that Gold's failure to receive the July 15, 2010 distributions directly resulted from the July 1 ex-distribution date and three-day due bill period, both of which were determined by the *NYSE*, and not by Ford or the Trust.

Gold states, in both his Amended Complaint and his opposition brief, that he sold shares of Trust Preferred Securities following Ford's announcement because "under prevailing practices, such market transactions do not settle for three days," leading him to believe that he would remain the "record holder of the sold Trust Preferred Securities at the close of business on June 30, 2010," thereby entitling him to receive the July 15, 2010 distributions for those shares. (D.I. 19 ¶ 16; D.I. 24 at 5) Thus, Gold's losses were incurred when the *NYSE* acted contrary to his expectations that drove his decision to sell his shares. The Amended Complaint does not plausibly allege any facts suggesting that his losses resulted from *Defendants'* conduct.

In the Court's view, even taking the allegations in the Amended Complaint as true and drawing all reasonable inferences in favor of Gold, it was the NYSE's actions in determining the ex-distribution date and due bill period that caused the losses incurred by Gold in connection with Ford's July 15, 2010 distributions.[4] Hence, the Court agrees with Defendants that the NYSE's actions constitute an intervening cause that disrupted the chain of causation necessary

---

[4]*See generally* Tr. at 50-51 (Plaintiff's counsel agreeing: "If the NYSE had done nothing, Mr. Gold would not have been harmed.").

for Gold to adequately plead loss causation as required under Section 10(b). *See McCabe*, 494

F.3d at 436; *see also Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) ("[A]n intervening act

of a third party, which actively operates to produce harm after the first person's wrongful act has

been committed, is a superseding cause which prevents the first person from being liable.").

Accordingly, because the Amended Complaint pleads facts precluding a finding of loss

causation under Section 10(b) of the Exchange Act, the Court will grant Defendants' motion to

dismiss for failure to state a claim.[5]

V.    **CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion to dismiss the

Amended Complaint. An appropriate order follows.

---

[5]Counts I, II, and III each allege a Section 10(b) violation, and must be dismissed for failure to
state a claim because loss causation is a necessary element for a Section 10(b) violation. Count
IV also must be dismissed because it asserts a Section 20(a) claim against Ford based on an
underlying Section 10(b) violation by the Trust.